# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SENECA SMITH, | ) |
| Plaintiff, | ) |
| | ) No. 10 C 5167 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| MICHAEL P. RANDLE et al., | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiff Seneca Smith has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, alleging that Defendants were deliberately indifferent to his serious medical needs. Doctor Sylvia Mahone and Physician Assistant Diane Schwartz were previously dismissed because Smith failed to state a claim against these Defendants. This matter is before the Court for ruling on Defendant Andria Bacot's motion for summary judgment [167] and Group-Defendants Michael P. Randle, Nancy Pounovich, Anthony Harris, Nicholas Gowdy, Mindi Pierce, Ovidu Botan, Jeffery Sawyer, Andrew Ellis, Sandra Griffin, Marcus Hardy, Clay Roby, Amy Gomez, Kevin Doyle, Patrick Mulligan, Orthello Hamilton, James Rogers, and Darryl Carter's motion for summary judgment [173]. Because Smith has not established the subjective element of his deliberate claim as to Defendant Bacot, the Court grants Bacot's motion for summary judgment. Similarly, the Court finds that Smith has failed to demonstrate that the non-medical Defendants were deliberately indifferent to his medical needs and the Court grants their motion for summary judgment as well.

BACKGROUND

I. **Compliance with Local Rule 56.1**

Defendants filed statements of uncontested material facts pursuant to Local Rule 56.1. Defendants also provided Smith "Notice to Pro Se Litigant Opposing Motion for Summary Judgment," as required by circuit precedent. Those notices clearly explained the requirements of the Local Rules and warned Smith that a party's failure to controvert the facts as set forth in the moving party's statement results in those facts being deemed admitted. *See, e.g.*, *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Local Rule 56.1(b) requires a party opposing a motion for summary judgment to file:

> (3) a concise response to the movant's statement that shall contain
>
> (A) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and
>
> (B) a statement, consisting of short numbered paragraphs, of any additional facts that require denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

N.D. Ill. L.R. 56.1(b).

The district court may rigorously enforce compliance with Local Rule 56.1. *See, e.g.*, *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." (citing *Ammons v. Aramark Uniform Serv., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004)). Although *pro se* plaintiffs are entitled to

lenient standards, compliance with procedural rules is required. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *see also Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1108 (7th Cir. 2004). "We have . . . repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005).

Despite the admonitions stated above, and ample opportunity to file a response,[1] Smith failed to file a response to either movants' statements of uncontested facts. Accordingly, the movants' statements of uncontested facts are deemed admitted.

## II. Facts[2]

Smith was first incarcerated at the Northern Reception Classification Center ("NRC") and was then transferred to the Stateville Correctional Center during the time of the occurrences alleged in his second amended complaint. Michael P. Randle was the Director of the Illinois Department of Corrections ("IDOC") during the relevant time period. Nancy Pounovich was a Superintendent at the NRC during the relevant time period. Anthony Harris was a Lieutenant at either the NRC or Stateville during the relevant time period. Nicholas Gowdy was a Correctional Officer at Stateville and did not work at the NRC during the relevant time period. Mindi Pierce, Ovidiu Botan, Andrew Ellis, Kevin Doyle, Patrick Mulligan, and Orthello Hamilton were

---

[1] On March 12, 2014, Smith was given until April 28, 2014 to file his response, and on May 27, 2014, Smith's late motion to extend time to respond was granted and he was given until June 24, 2014 to file his response.

[2] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1. They are taken in the light most favorable to Smith, the non-movant. The Court has included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motions for summary judgment.

3

Correctional Officers at the NRC or Stateville during the relevant time period. Sandra Griffin was a sergeant at the NRC during the relevant time period. Marcus Hardy was the Warden of the NRC and Stateville at the relevant time period. Clay Roby was a Sergeant at Stateville during the relevant time period. Amy Gomez was a Counselor at the NRC during the relevant time period. James Rogers was a Correctional Officer at Stateville during the relevant time period. There are no allegations against Defendant Rogers in the second amended complaint. Darryl Carter was a Lieutenant at either the NRC or Stateville during the relevant time period. Andrea Bacot is a licensed practical nurse in Illinois. Bacot was employed by Wexford Health Sources, Inc., working at the NRC and Stateville during the relevant time period. Part of Bacot's responsibilities included distributing psychotropic medications to inmates in their cells at the NRC and Stateville.

Smith entered into IDOC custody through the NRC on July 9, 2010. That same day, he was examined by various medical staff members as part of a routine medical examination provided to all detainees when entering into IDOC custody. Smith informed a doctor that he sustained nerve damage and had been taking Neurontin to help manage his pain. He also told the doctor that he suffered from sleep apnea and had been sleeping with the assistance of a Continuous Airway Pressure Device ("CPAP") machine. The doctor noted "Neurontin, sleep apnea-CPAP, Left arm radial nerve damage" in Smith's medical chart.

Smith received an x-ray at the NRC Health Care Unit on July 12, 2010. While waiting for his x-ray, he informed Hamilton about his nerve damage and sleep apnea. Hamilton told Smith there was nothing that Hamilton could do for him and encouraged him to inform the Health Care Unit ("HCU") in writing. Smith received medication prescribed by Dr. Diane

Schwartz that same day.  As Smith was leaving the HCU, he informed Harris about his nerve damage.  Harris explained to Smith that Harris could not help Smith with his medical concerns and reminded him to address his concerns with professionals within the HCU.

On August 10, 2010, Smith was seen by a physician and he received Neurontin for his pain for first time since entering the NRC.  Throughout the month of August 2010, Smith received other medication prescribed to him by medical professionals for his nerve damage.  Smith was transferred from the NRC to Stateville on August 26, 2010.

Smith was seen by a physician on September 13, 2010, who noted Smith's sleep apnea.  That same day, Smith received a permit for wrist support for his left hand.  There is no indication that permission was granted for a CPAP machine.  Smith continued to be under the care of medical professionals through December 2010.  During this time, he failed to appear for an appointment on October 1, 2010, and had his November 9, 2010 and November 11, 2010 appointments rescheduled due to a facility lockdown.

On December 16, 2010, a physician indicated that a referral request was received from Dr. Ghosh for Smith to receive a sleep study.  The physician indicated that he reviewed the request and requested a copy of Smith's prior sleep study.  On April 14, 2011, Smith signed an authorization for his sleep study results to be released from Northwestern Hospital.  On April 27, 2011, Smith's previous sleep study was reviewed and Dr. Garcia approved Smith for an onsite sleep study.

On May 5, 2011, Smith failed to appear for his medical appointment.  He was seen by a physician's assistant on May 9, 2011, who indicated that Smith requested a follow-up on the status of a CPAP machine.  The physician's assistant indicated a referral of the request to the

medical director. On May 9, 2011, Smith received a prescription for Neurontin for three months. On May 20, 2011, Smith was seen by a physician's assistant at which time Smith was informed that he had been approved for a sleep study. Smith indicated that he understood the physician assistant's explanation.

Smith underwent a sleep study on August 1, 2011. He was diagnosed with a very mild obstructive sleep apnea. On August 20, 2011, he received a prescription for Neurontin for three months. Smith continued to be under the care of health care professionals through October 31, 2011. On this date, the medical director approved a CPAP mask and tubing for Smith. The device and face mask were ordered on November 3, 2011. Smith received a prescription for Neurontin for three months on November 30, 2011 and March 14, 2012. On July 9, 2012, Smith was given a prescription for Neurontin for six months. On August 16, 2012, Smith complained that he still did not have a CPAP machine and that he was not regularly receiving his Neurontin. Smith continued to be under the care of health care professionals through September 24, 2012, when he received a CPAP machine and a medical permit granting him permission to have possession of the CPAP machine. Smith also continued to receive prescriptions for Neurontin.

Correctional Officers Mulligan, Botan, Doyle, Douglas, Ellis, and Pierce were assigned to oversee security of Smith's living unit at the NRC on select dates during the months of July and August 2010. Smith states that he informed these officers that he had nerve damage and sleep apnea, but the officers did not provide Smith with immediate medical attention. Smith states that Roby, a Sergeant supervising yard lines, ignored Smith after he informed him of his nerve damage and sleep apnea. Specifically, Smith was walking out of his cell and spoke to Roby

while Roby was running the yard line, and Roby told Smith that he had no time at that moment to handle Smith's concern.

Smith also states that he informed Griffin, Harris, Sawyer, Gowdy, and Carter of his nerve damage and sleep apnea, but these Defendants did not assist him with his medical concerns. Smith recalls speaking with Sawyer at only one point in time, in the hallway as he was walking to another place in the facility. Smith remembers speaking to Gowdy about his request for Neurontin at some point prior to August 10, 2010 but does not recall speaking to Gowdy about his request for a CPAP machine.

Smith wrote letters to Gomez, Randle, Hardy, and Pounovich, informing them of his nerve damage and sleep apnea and seeking medical assistance, but he did not receive a response. Smith wrote two letters to Randle but never spoke with him. Smith saw Pounovich one time while she was walking down a hall and asked her about a letter he sent her. Smith sent one letter to Hardy but never spoke with him. Gomez was Smith's counselor while he was in the NRC.

Bacot never received and was never involved in reviewing any written request from Smith and she did not perform his intake evaluation. Bacot has no recollection of ever treating Smith in a clinical setting. While Bacot would be distributing medications to inmates' cells in 2010, it was not the procedure to stop and examine inmates or otherwise evaluate them in a clinical setting as to do so would make it nearly impossible to complete her duty to distribute the inmates' medications. It is a regular daily occurrence that inmates make a variety of complaints to nurses while they are distributing medications to cells. Bacot does not recall Smith ever making any complaints to her. Bacot did not have the authority to evaluate or order treatment for

Smith's complaints. The medication and CPAP machine Smith sought had to be ordered by a physician.

Smith states that when nurses, including Bacot, would be passing out medications, he would request help from them for his nerve damage and sleep apnea. Smith states that he addressed the nurses every time they gave him his medications. When Smith asked for assistance from the nurses, they "all basically told [him] no, they are not doing anything, they are passing out the medication. They are not going to assist me in getting treatment, I was bothering them because they had a job to do and they had hundreds of more detainees to get to."

Security personnel at the NRC and Stateville include the Warden, Superintendent, Majors, Sergeants, Lieutenants, and Correctional Officers. Security personnel do not have the authority to provide offenders with medical care. In situations that warrant a life-threatening emergency, security personnel immediately seek medical professional assistance for the individual requiring such emergency care. Security personnel do not have the authority to schedule inmates to be seen in the HCU by a medical professional. For non-emergency medical care, inmates must submit a written sick call request or make such a request upon a medical professional. Security personnel are not trained to provide professional medical care and are required to defer to medical treatment of inmates to the trained and licensed medical professionals.

Upon admission to the IDOC, each inmate is provided the procedure for inmates to request to be seen for health care issues. The procedure requires inmates to send a written request to the health care unit at which time an inmate will be added to the sick call. In addition, upon admission to the custody of the NRC, inmates are given a medical examination.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

Correctional officials and health care providers may not act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 251 (1976); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). Deliberate indifference has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d

811 (1994); *Estelle*, 429 U.S. at 103–04; *see also Roe v. Elyea*, 631 F.3d 843, 862 (7th Cir. 2011).

An objectively serious medical need is something that "has been diagnosed by a physician as mandating treatment" or one that is so obvious that a lay person would recognize the need for medical attention. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Here, both of Smith's medical conditions required medical treatment. Accordingly, Smith has demonstrated an objectively serious medical condition. *See, e.g.*, *Dortch v. Davis*, No. 11-cv-0841-MJR-SCW, 2014 WL 1125588, at *5 (S.D. Ill. March 21, 2014) (finding sleep apnea an objectively serious medical condition).

As to the subjective element of a deliberate indifference claim, a prisoner must demonstrate that the defendant in question was aware of and consciously disregarded the inmate's medical need. *Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 103–04; *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). Neither negligence nor gross negligence constitutes deliberate indifference. *Farmer*, 511 U.S. at 836. Instead, the standard is comparable to that required in demonstrating criminal recklessness. *Id.* at 839.

Claims of deliberate indifference to a prisoner's medical needs are examined differently depending on whether the defendant is a medical professional or a lay person. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2103). A medical professional may be found to have acted with deliberate indifference if her decision "is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not actually base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008). Lay persons who are not responsible for administering medical care are entitled to rely on and

defer to the judgment of medical professionals. *Id.* at 483; *King*, 680 F.3d at 1018. However, a lay person may be found to have been deliberately indifferent to an inmate's medical needs if he has actual knowledge or has reason to believe that medical personnel are not treating or are mistreating a prisoner. *King*, 680 F.3d at 1018.

Here, only Defendant Bacot, a nurse, is a medical professional. As to Bacot, she never received and was never involved in reviewing any written request from Smith for medical attention and she did not treat Smith in a clinical setting. The alleged basis for liability is Smith's allegation that he would tell nurses that he needed help with his nerve damage and sleep apnea. Smith was informed by the nurses that they could not treat him and that all they were doing was passing out medications. In addition, Smith was aware of the proper procedure to request medical care. Bacot, nor any of the nurses, had the authority to treat Smith. The nursing staff could not prescribe his medication or a sleep apnea machine. Lastly, there is no evidence that Smith's medical condition was obviously serious and that he needed immediate medical attention. To demonstrate that a defendant acted with a "sufficiently culpable state of mind" so as to survive summary judgment, a plaintiff must put forth evidence to establish that the defendant knew of a serious risk to the inmate's health and that the defendant consciously disregarded that risk—this requires more than negligence, approaching intentional wrongdoing. *Holloway v. Del. County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). Smith has not established the subjective element of his deliberate claim as to Defendant Bacot. *See Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (communication of needed medical care must give the prison official sufficient notice to alert her of an excessive risk to the inmate's health).

Similarly, Smith has not established the subjective element of his claim as to the lay-person (non-medical) Defendants. Smith recalls informing several correctional officers, in passing, that he needed medical care for his nerve damage and a sleep apnea machine. Several correctional officers informed Smith that they could not help him with his medical needs and that he needed to submit a sick call request. Smith also sent a letter and/or spoke once with prison administration about his nerve damage and his sleep apnea. He was aware of the proper procedure to receive medical attention and utilized that procedure.

As with Defendant Bacot, the non-medical Defendants could not treat Smith's medical condition and they could not prescribe medication or the sleep apnea machine. As already discussed, there is no evidence that Smith's medical condition was obviously serious and that he needed immediate medical attention. Smith has failed to demonstrate that the non-medical Defendants were deliberately indifferent to his medical needs. *See McGee* 721 F.3d at 483 (no deliberate indifference by security personnel who relied on medical professionals' decision to not order plaintiff to be exempt from leg irons); *King*, 680 F.3d at 1018 (correctional officers were not deliberately indifferent to detainee's medical needs because there was no evidence that detainee was not being properly treated by doctor); *Vance*, 97 F.3d at 994 (letters to prison officials did not demonstrate that the officials were aware of a serious risk to plaintiff's medical needs to demonstrate deliberate indifference).

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment [167, 173] are granted. The Clerk is directed to enter judgment in favor of Defendants: Andria Bacot, Michael P. Randle, Nancy Pounovich, Anthony Harris, Nicholas Gowdy, Mindi Pierce, Ovidu Botan,

Jeffery Sawyer, Andrew Ellis, Sandra Griffin, Marcus Hardy, Clay Roby, Amy Gomez, Kevin Doyle, Patrick Mulligan, Orthello Hamilton, James Rogers and Darryl Carter, pursuant to Federal Rule of Civil Procedure 56.

In light of the previous dismissal of Physician Assistant Schwartz and Dr. Mahone and the granting of the instant motions, the only remaining Defendants are those that have never been served with Smith's second amended complaint because their full identities needed to be determined: Defendants Officer Williams, Officer Douglas, Officer Brown, Nurse Banks, and Nurse Williams. Smith's second amended complaint was accepted on May 25, 2012. Smith has been aware that the identities of these parties needed to be determined so that they could be served the second amended complaint and his notion to compel answers to interrogatories to learn their identities was granted on September 27, 2013. On September 27, 2013, Defendants answered Smith's interrogatories. Smith has failed to submit an amended complaint naming these individuals so that they could be served and has not attempted service or moved the court to attempt service on these individuals. Because two years have passed since Smith's second amended complaint was filed and over 250 days have elapsed since Smith received the response to his interrogatories, these Defendants are dismissed for lack of service. Fed. R. Civ. P. 4(m). The case is terminated.

If Smith wishes to appeal this final order, he may file a notice of appeal with this Court within thirty days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues Smith plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If Plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee regardless of the outcome of the appeal. *Evans v. Ill. Dep't of Corr.*, 150 F.3d

13

810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, Smith may also be assessed a "strike" under 28 U.S.C. § 1915(g). Smith is warned that, pursuant to that statute, if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury. *Id.*

Dated: July 18, 2014

_____
SARA L. ELLIS
United States District Judge